BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:   (858) 914-2001
Facsimile:   (858) 914-2002
Email:        fbottini@bottinilaw.com
             achang@bottinilaw.com
             ykolesnikov@bottinilaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GREGORY M. MILLER, derivatively on behalf of SOLAZYME, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JONATHAN S. WOLFSON, MICHAEL V. ARBIGE, IAN T. CLARK, JAMES R. CRAIGIE, JERRY FIDDLER, PETER KOVACS, DAVID C. COLE, and TYLER W. PAINTER, <br><br> Defendants, <br><br> - and - <br><br> SOLAZYME, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. _____ <br><br> **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

## Table of Contents

I.      NATURE OF THE ACTION ................................................................. 1

II.     JURISDICTION AND VENUE ............................................................ 3

III.    THE PARTIES..................................................................................... 4

        A.      Plaintiff ................................................................................... 4

        B.      Nominal Defendant ................................................................. 4

        C.      The Individual Defendants ...................................................... 4

                (1)     The Director Defendants ............................................... 4

                (2)     The Officer Defendants ................................................. 6

IV.     THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES ............ 6

        A.      General Duties as Directors and Officers ................................ 6

        B.      Solazyme's Code of Business Conduct and Ethics ................. 8

        C.      The Audit Committee Charter .................................................. 9

        D.      The Duty of Reasonable and Prudent Supervision ............... 11

V.      BREACHES OF FIDUCIARY DUTIES ........................................... 12

VI.     CONTROL, ACCESS, AND AUTHORITY....................................... 13

VII.    CONSPIRACY AND CONCERTED ACTION ................................. 13

VIII.   FACTUAL ALLEGATIONS.............................................................. 15

        A.      The Individual Defendants Caused Solazyme to Issue
                Materially False and Misleading Statements During the
                Relevant Period ..................................................................... 15

                (1)     Solazyme's 2013 10-K ............................................... 17

                (2)     Solazyme's Offering Documents ................................ 19

                (3)     Solazyme's First Quarter 2014 Financial Report ....... 21

                (4)     Solazyme's Second Quarter 2014 Financial Report ... 23

        B.      The Truth Emerges ................................................................ 24

IX.     DAMAGES TO SOLAZYME............................................................ 27

i

X.      DERIVATIVE ALLEGATIONS .................................................................. 27

        A.    Demand Is Futile as to Wolfson and Kovacs ........................................ 28

        B.    Demand Is Futile as to Craigie and Fiddler ......................................... 29

        C.    Demand Is Futile as to All Director Defendants ................................... 31

XI.     CAUSES OF ACTION .......................................................................... 33

        Count I
        Breaches of Fiduciary Duties ........................................................... 33

        Count II
        Unjust Enrichment ........................................................................ 34

        Count III
        Gross Mismanagement ................................................................... 35

XII.    PRAYER FOR RELIEF ......................................................................... 35

        DEMAND FOR JURY TRIAL ................................................................. 37

Verified Shareholder Derivative Complaint
Demand for Jury Trial

Plaintiff Gregory M. Miller ("Plaintiff"), derivatively on behalf of nominal defendant Solazyme, Inc. ("Solazyme" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Jonathan S. Wolfson, Michael V. Arbige, Ian T. Clark, James R. Craigie, Jerry Fiddler, Peter Kovacs, David C. Cole, and Tyler W. Painter (collectively, the "Individual Defendants") for breaches of fiduciary duties, unjust enrichment, and gross mismanagement. In support of these claims, Plaintiff alleges upon personal knowledge with respect to those allegations pertaining to himself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and investigations undertaken by his counsel, as to all other allegations, as follows. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth below after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of Solazyme against the Individual Defendants — six current members of its Board of Directors (the "Board") and two former officers — for wrongdoing that occurred from February 27, 2014 to the present (the "Relevant Period").

2.     A bioproducts company founded in 2003 and headquartered in San Francisco, California, Solazyme uses proprietary, algae-based fermentation technology to produce renewable oils for a range of personal and industrial uses. Solazyme's technology involves utilizing microalgae in an industrial fermentation process to transform plant-based sugars into sustainable, high-performance products. Solazyme maintains manufacturing facilities in California, Illinois, Iowa, and Brazil. Incorporated under Delaware law, Solazyme's stock is traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "SZYM."

3.     Since at least the beginning of the Relevant Period, the Individual Defendants caused Solazyme to issue false and misleading statements regarding

Solazyme's financial performance and business prospects. Specifically, the Individual Defendants caused Solazyme to disseminate periodic positive assessments of and omitted material adverse information regarding the construction progress, development, and production capacity associated with Solazyme's renewable oils production facility located in Moema, Brazil (the "Moema Facility").

4.    As detailed below, Solazyme's financial statements during the Relevant Period were false and misleading.

5.    While false and misleading financial statements were being disseminated to the public, the Individual Defendants caused Solazyme to make two registered public offerings during the Relevant Period.

6.    On March 27, 2014, the Individual Defendants caused Solazyme to execute a public notes offering (the "Notes Offering") through which Solazyme sold approximately $149.5 million in convertible notes (including the full exercise of an underwriters' option) paying 5% interest and scheduled to mature in 2019 (the "Notes").

7.    Also on March 27, 2014, the Individual Defendants caused Solazyme to conduct a separate public secondary offering of common stock (the "Stock Offering," and together with the Notes Offering, the "Offerings"), pursuant to which Solazyme sold 5.75 million shares of stock (including the full exercise of an underwriters' option) at $11.00 per share for aggregate gross proceeds of approximately $63.25 million.

8.    Because the Individual Defendants caused Solazyme to issue false and misleading statements regarding its financial condition and business prospects, investors purchased the Notes and Solazyme common stock at artificially inflated prices during the Relevant Period.

9.    The ultimate disclosure of the truth about the construction delays and diminished production capacity of the Moema Facility caused a precipitous decline in

Verified Shareholder Derivative Complaint
Demand for Jury Trial

the market value of Solazyme's securities. The Company's stock price declined $4.35 per share, or 58.08%, to close at $3.14 per share following the next trading session on November 6, 2014. Similarly, the market price of Solazyme's Notes declined by $235.00 per Note from the prior reported trade on November 4, 2014, or 30.32%, to close at $540.00 per Note following the next session in which the Notes traded on November 7, 2014. The decline in prices of Solazyme's securities resulted in significant losses and damages to Solazyme and its shareholders.

10.     Alleging violations of the federal securities laws, investors who purchased Solazyme stock between February 27, 2014 and November 5, 2014 have commenced a class action in this District, *Norfolk County Retirement System v. Solazyme, Inc.*, No. 15-cv-2938 (N.D. Cal.) (the "Securities Class Action").

11.     Solazyme's market capitalization has been severely diminished and its prospect of raising equity in the future is questionable. Solazyme has incurred and continues to incur substantial expenses in defending the Securities Class Action. To recover damages and obtain injunctive relief on Solazyme's behalf, Plaintiff brings this derivative action.

## II.     JURISDICTION AND VENUE

12.     Subject-matter jurisdiction exists under 28 U.S.C. § 1332 because there is complete diversity between Plaintiff and defendants and because the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

13.     This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

14.     Venue is proper in this District under 28 U.S.C. §§ 1391 and 1401 because Solazyme maintains its principal executive offices in this District and because a substantial portion of the acts and conduct complained of herein — including the dissemination of materially false and misleading information to the investing public — occurred in this District.

Verified Shareholder Derivative Complaint
Demand for Jury Trial

15.     Each Individual Defendant has minimum contacts with this District, as they have entered into contracts in this District, or have frequently traveled here, on Solazyme's business, or have authorized acts and actions that have had a sufficient impact in this District or on Solazyme's shareholders and investors residing here to justify the exercise of jurisdiction over them.

### III.     THE PARTIES

**A.     Plaintiff**

16.     Plaintiff Gregory M. Miller is a current shareholder of Solazyme. Plaintiff has continuously held Solazyme stock throughout the Relevant Period. Plaintiff is a citizen of North Carolina.

**B.     Nominal Defendant**

17.     Nominal defendant Solazyme, Inc. is a Delaware corporation with its principal place of business located at 225 Gateway Boulevard, San Francisco, California. Solazyme is a citizen of California and Delaware.

**C.     The Individual Defendants**

    **(1)     The Director Defendants**

18.     Defendant Jonathan S. Wolfson is a director and co-founder of Solazyme. Wolfson has been Solazyme's Chief Executive Officer ("CEO") since 2008. Between 2003 (when he co-founded Solazyme) and 2008, Wolfson was Solazyme's President and Chief Operating Officer ("COO"). In 2014 alone, Wolfson received from Solazyme approximately $2,960,854 in compensation. In Solazyme's March 26, 2015 proxy, Solazyme admits that Wolfson is not an independent director. Upon information and belief, Wolfson is a citizen of California.

19.     Defendant Michael V. Arbige has been a director of Solazyme since 2005. Arbige is a member of the Nominating and Corporate Governance Committee and the Compensation Committee. In 2014 alone, Arbige received from Solazyme approximately $160,433 in director compensation. Upon information and belief, Arbige is a citizen of California.

20. Defendant Ian T. Clark has been a director of Solazyme since 2011. Clark is a member of the Nominating and Corporate Governance Committee and Chair of the Compensation Committee. In 2014 alone, Clark received from Solazyme $150,433 in director compensation. Upon information and belief, Clark is a citizen of California.

21. Defendant James R. Craigie has been a director of Solazyme since 2013. Craigie is a member of the Audit Committee and Compensation Committee. In 2014 alone, Craigie received from Solazyme $160,433 in director compensation. Upon information and belief, Craigie is a citizen of New Jersey.

22. Defendant Jerry Fiddler has been a director and Chairman of Solazyme since 2004. Fiddler is also a member of the Audit Committee and Chair of the Nominating and Corporate Governance Committee. In 2014 alone, Fiddler received from Solazyme $206,555 in director compensation. Upon information and belief, Fiddler is a citizen of California.

23. Defendant Peter Kovacs has been a director of Solazyme since 2013. Kovacs has also been a member of Solazyme's Strategic Advisory Board since 2007. Kovacs is also a member of Solazyme's Scientific Advisory Board. In 2014 alone, Kovacs received from Solazyme $130,433 in director compensation. In Solazyme's March 26, 2015 proxy, Solazyme admits that Kovacs is not an independent director. Upon information and belief, Kovacs is a citizen of Nevada.

24. Defendants Wolfson, Arbige, Clark, Craigie, Fiddler, and Kovacs are collectively referred to as the "Director Defendants."

25. Defendants Craigie and Fiddler are collectively referred to as the "Audit Committee Defendants."

///

///

///

Verified Shareholder Derivative Complaint
Demand for Jury Trial

**(2)   The Officer Defendants**

26.   Defendant David C. Cole was employed as Solazyme's President between January 1, 2014 and October 8, 2014. For that nine-month period alone, Cole received $7,219,002 in compensation. Upon information and belief, Cole is a citizen of California.

27.   Defendant Tyler W. Painter is Solazyme's COO and Chief Financial Officer ("CFO"). In 2014 alone, Painter received from Solazyme $4,315,468 in compensation. Upon information and belief, Painter is a citizen of California.

## IV.   THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

### A.   General Duties as Directors and Officers

28.   By reason of their positions as Solazyme's officers and directors and because of their ability to control Solazyme's business and corporate affairs, the Individual Defendants owed Solazyme and its shareholders fiduciary obligations of trust, loyalty, good faith, candor, and due care, and were required to use their utmost ability to control and manage Solazyme in a fair, just, honest, and equitable manner. The Individual Defendants were required to act in furtherance of the best interests of Solazyme and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

29.   Each director and officer owes to Solazyme and its shareholders the fiduciary duty to exercise good faith and diligence, as well as the highest obligations of loyalty and fair dealing, in the administration of Solazyme's affairs and in the use and preservation of its property and assets.

30.   The Individual Defendants, because of their positions of control and authority as Solazyme's directors and officers, were able to and did directly and/or indirectly, exercise control over the misconduct complained of herein.

31.   To discharge their duties as Solazyme's officers and directors, the Individual Defendants were required to exercise reasonable and prudent supervision

over Solazyme's management, policies, practices, and controls of the affairs of the Company. Accordingly, the Individual Defendants were required to:

    (a)    ensure that Solazyme was operated in a diligent, honest, and prudent manner in accordance with its bylaws and charter, as well as the laws and regulations of Delaware and the United States;

    (b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

    (c)    remain informed as to how Solazyme conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

    (d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Solazyme and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

    (e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Solazyme's operations would comply with all laws and its financial statements filed with the United States Securities Exchange Commission ("SEC") and disseminated to the public and Solazyme's shareholders would be accurate;

    (f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

Verified Shareholder Derivative Complaint
Demand for Jury Trial

(g)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, among other things, each of the subjects and duties set forth above.

32.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities Exchange Act of 1934 (the "Exchange Act") and traded on the NASDAQ, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects; and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations. Thus, the Individual Defendants breached their fiduciary duties by causing or recklessly permitting violations of the federal securities laws.

**B.     Solazyme's Code of Business Conduct and Ethics**

33.     Solazyme's Code of Business Conduct and Ethics (the "Code"), as updated in April 2011, provides a "guide" for all business conduct. All employees, officers, and directors must act "according to the language and spirit of this Code and seek to avoid even the appearance of improper behavior."

34.     The Code requires that all "employees, officers and directors" conduct Solazyme's "business affairs with honesty and integrity and in full compliance with all applicable laws, rules and regulations." The Code further prohibits any "illegal or unethical act … for any reason."

35.     With respect to Solazyme's public disclosures, the Code states:

Verified Shareholder Derivative Complaint
Demand for Jury Trial

The Company has a responsibility to provide full and accurate information in our financial reporting and public disclosures, in all material respects, including regarding the Company's financial condition and results of operations. Our reports and documents filed with or submitted to the Securities and Exchange Commission and our other public communications shall include full, fair, accurate, timely and understandable disclosure, and the Company has established a Disclosure Committee consisting of senior management to assist in monitoring such disclosures.

## C.     The Audit Committee Charter

36.     During the Relevant Period, defendants Craigie and Fiddler are members of the Audit Committee. Thus, they are obligated to ensure, among other things, that Solazyme complies with all legal and regulatory requirements.

37.     As stated in Solazyme's Audit Committee Charter, adopted in April 2011, the Audit Committee's roles are to "assist the Board in its oversight of":

- the integrity of the financial statements of the Company;

- the qualifications, independence and performance of the Company's independent auditor;

- the performance of the Company's internal audit function; and

- compliance by the Company with legal and regulatory requirements[.]

Furthermore, the Audit Committee is responsible for "prepar[ing] the Audit Committee report that the Securities and Exchange Commission rules require to be included in the Company's annual proxy statement."

38.     The Audit Committee is required to review and approve all financial statements of the Company by "meet[ing] to review and discuss with management and the independent auditor":

- the annual audited financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of the Company's Form 10-K; and

- the quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and

9

Results of Operations," prior to the filing of the Company's Form 10-Q.

39.   The Audit Committee is also required to "review with management, the internal auditors and the independent auditor":

- any analyses or other written communications prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative [Generally Accepted Accounting Principles ("GAAP")] methods on the financial statements;

- the critical accounting policies and practices of the Company;

- the effect of off-balance sheet transactions and structures;

- any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

- the effect of regulatory and accounting initiatives.

40.   Furthermore, with respect to internal controls, the Audit Committee is required to, "in conjunction with the [CEO and CFO] of the Company, review the Company's disclosure controls and procedures and internal control over financial reporting." The Audit Committee's review must "include whether there are any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to affect the Company's ability to record, process, summarize and report financial information and any fraud involving management or other employees with a significant role in internal control over financial reporting."

41.   The Audit Committee is also required to "review any special audit steps adopted in light of material control deficiencies."

42.   Finally, the Audit Committee is required to "review the Company's policies and practices with respect to risk assessment and risk management,

including discussing with management the Company's major financial risk exposures and the steps that have been taken to monitor and control such exposures."

**D.    The Duty of Reasonable and Prudent Supervision**

43.    The Individual Defendants are required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the Individual Defendants are required to, among other things:

(a)    ensure that Solazyme maintains adequate internal controls over financial reporting;

(b)    refrain from acting upon material inside corporate information to benefit themselves;

(c)    ensure that Solazyme complies with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(d)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(e)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(f)    remain informed as to how Solazyme conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(g)     ensure that Solazyme was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## V.     BREACHES OF FIDUCIARY DUTIES

44.    Each Individual Defendant owed to Solazyme and to its shareholders the fiduciary duty of loyalty and good faith, and the exercise of due care and diligence in managing and overseeing Solazyme's affairs, as well as in the use and preservation of its property and assets. The Individual Defendants' misconduct involves a knowing and culpable violation of their obligations as directors and officers of Solazyme, the absence of good faith on their part, or a reckless disregard of their duties that they were aware or should have been aware posed a risk of serious injury to Solazyme. Each Individual Defendant ratified each other's misconduct because they collectively comprised Solazyme's Board and management at all relevant times.

45.    The Individual Defendants each breached their duties of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements and/or failing to disclose that:

(a)     Solazyme's Moema Facility was experiencing difficulties due to insufficient access to electricity and steam utility services;

(b)     the Moema Facility's design and construction relating to the internal transfer of materials and recovery of end products caused it to suffer from problems not present at the Company's other facilities;

(c)     the Moema Facility could not scale its production in a cost-effective manner;

(d)     the Company lacked adequate internal and financial controls;

(e)     as a result of the foregoing, Solazyme lacked a reasonable basis for its projections relating to the Moema Facility's progress and the

12

Company's outlook; and

(f)     the Company's financial statements were materially false or misleading at all relevant times.

46.     In addition, as a result of the Individual Defendants' misconduct, the Company is now a defendant in the Securities Class Action, which alleges violations of federal securities laws. As a result, Solazyme has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## VI.    CONTROL, ACCESS, AND AUTHORITY

47.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Solazyme.

48.     Because of their advisory, executive, managerial, and directorial positions with Solazyme, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Solazyme.

49.     Each Individual Defendant was the agent of another and of Solazyme, and was at all times acting within the course and scope of such agency.

## VII.    CONSPIRACY AND CONCERTED ACTION

50.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did conceal the fact that:  (a) Solazyme was improperly recording revenue; (b) Solazyme lacked

adequate internal and financial controls; and (c) as a result of the foregoing, Solazyme's financial statements were materially false or misleading at all relevant times. In furtherance of this plan, conspiracy, and course of conduct, Defendants collectively and individually took the actions set forth herein.

52. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct by causing Solazyme to issue false and misleading financial information and by failing to disclose Solazyme's lack of adequate internal controls.

53. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, and unjust enrichment; and (b) disguise and misrepresent the Company's financial condition and business prospects.

54. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing Solazyme to falsely represent that Solazyme had adequate internal controls in place, and by purposefully, recklessly, or negligently causing Solazyme to release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

55. Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his (or her or its) overall contribution to and furtherance of the wrongdoing.

## VIII. FACTUAL ALLEGATIONS

**A.** **The Individual Defendants Caused Solazyme to Issue Materially False and Misleading Statements During the Relevant Period**

56.     In May 2011, Solazyme entered into an agreement with Bunge Global Innovation, LLC, a unit of the agribusiness company Bunge Limited ("Bunge"), to jointly develop microbe-derived oils from Brazilian sugarcane feedstock. In 2012, the Company entered into a joint venture agreement with Bunge to build, own, and operate the Moema Facility adjacent to Bunge's sugarcane mill in Moema, Brazil. Under the joint venture agreement, Bunge agreed to provide feedstock as well as utility services to the Moema Facility. The Moema Facility was originally projected to be completed around the end of 2013.

57.     The Moema Facility and its operation constitute part of Solazyme's core business. For example, the development of the Moema Facility was one of the four important topics featured in Solazyme's July 30, 2015 press release regarding its second quarter 2015 financial results. According to Solazyme's Form 10-K, filed on March 6, 2015, the Moema Facility is one of Solazyme's three producing facilities as of May 2014 (the other two facilities are located at Clinton, Iowa and Galva, Iowa). In fact, Solazyme's Brazil operation is so important that its website is accessible in Portuguese.

58.     Even before the Relevant Period, Solazyme offered periodic positive assessments of the Company's progress regarding the Moema Facility. For example, as part of his comments relating to the Company's announcement of operating results for the second quarter of 2013 on August 7, 2013, defendant Painter stated:

> Our second quarter results keep us on track to achieve our full year objectives. Our operating and capital expenditures remain within our expectations. As we near the commencement of production at Moema and Clinton, our commercialization path is supported by a strong capital structure and a supportive group of partners.

59.     On February 13, 2014, the Individual Defendants caused Solazyme to

15

Verified Shareholder Derivative Complaint
Demand for Jury Trial

1    file an automatic shelf-registration statement on Form S-3ASR with the SEC for the

2    public offering of stock, debt, and other securities from time to time thereafter. The

3    Individual Defendants signed this registration statement.

4          60.     After the markets closed on February 26, 2014, the Individual

5    Defendants caused Solazyme to issue a press release announcing results for the

6    fourth quarter and full year of 2013. Commenting on these results, Wolfson stated in

7    part:

> In the first half of 2014, we are focused on successfully
> executing Solazyme's entry into broad commercial
> operations. We have begun shipping multiple products from
> the Clinton/Galva, Iowa facilities and are *deep into
> commissioning in Brazil* as we complete the first-of-its-kind
> 100,000 MT Solazyme Bunge Renewable Oils (SB Oils)
> facility at Moema. In these early days we are focused on
> generating consistent and reliable production for our
> partners, ahead of accelerating our production ramp later
> this year.

13          61.     Also on February 26, 2014, Solazyme hosted a conference call for

14    investors and analysts, with the approval of the Individual Defendants, to discuss

15    the Company's results. As part of his prepared remarks, Wolfson stated in part:

> We're making *strong and steady progress at Moema*. We're
> currently *deep into the commissioning process*. To really
> understand the progress, it's useful to break out the major
> unit operations in the facility. *The plant requires
> infrastructure, including utilities such as steam and power*,
> and additional capabilities like cleaning and sterilization
> systems.

>               *        *        *

> *Infrastructure and upstream which together comprise a
> substantial percentage of the plant, are both currently online
> and everything is functioning as expected.*

>               *        *        *

> We believe that the progress at Moema and its current
> schedule leaves us *in good shape to bring full production
> online this spring*, and with the anticipated 12 to 18-month
> scale-up process, this puts us *on track to reach full
> nameplate capacity in the back half of 2015*, as we suggested
> on the last call.

Verified Shareholder Derivative Complaint
Demand for Jury Trial

**(1)   Solazyme's 2013 10-K**

62.   The following month, on March 14, 2014, the Individual Defendants caused Solazyme to file its Annual Report for 2013 on Form 10-K with the SEC (the "2013 10-K"). All Individual Defendants signed Solazyme's 2013 10-K.

63.   Under the Individual Defendants' direction and approval, Solazyme's 2013 10-K made the following statements regarding the construction progress, development, and production capacity associated with the Moema Facility:[1]

> *Our process is compatible with commercial-scale, widely-available fermentation and oil recovery equipment.* We operate our lab and pilot fermentation and recovery equipment as scaled-down versions of our large commercial engineering designs, such as those used to supply large quantities of oil for our algae-derived fuel delivered for testing and certification programs with the U.S. Department of Defense. This allows us to more easily scale up to larger fermentation vessels. We have scaled up our technology platform and have successfully operated at lab (5-15 liter), pilot (600-1,000 liter), demonstration (75,000 liter) and commercial (approximately 120,000–500,000 liter and above) fermenter scale. *The commercial scale achieved at ADM's Clinton Facility is comparable to the fermentation equipment at the Solazyme Bunge Renewable Oils facility in Brazil.*

> \*      \*      \*

> *[T]he commissioning of the facility at Moema is underway. As such, we are now expanding into large-scale, high-volume commercial production* and sales of intermediate and ingredient products across food, industrial, fuel and personal care markets.

> \*      \*      \*

> The Solazyme Bunge JV is currently constructing a production facility adjacent to Bunge's Moema sugarcane mill in Brazil, and commissioning is underway. *We are targeting the production of commercially saleable product by the end of the first quarter of 2014,* though such production could move into the second quarter. *The production facility is expected to have a name plate capacity of 100,000 [metric tons] of oil per year.*

64.   The Company's 2013 10-K also included a certification under the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") signed by Wolfson, which stated:

---

[1] All emphases are added unless otherwise noted.

17

Verified Shareholder Derivative Complaint
Demand for Jury Trial

I, Jonathan S. Wolfson, certify that:

1.     I have reviewed this Annual Report on Form 10-K of Solazyme, Inc.;

2.     Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.     Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)     Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)     Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)     Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

Verified Shareholder Derivative Complaint
Demand for Jury Trial

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a)     All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)     Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

The Company's 2013 10-K further included a substantially similar certification signed by Painter.

**(2)     Solazyme's Offering Documents**

65.     On March 25, 2014, the Individual Defendants caused Solazyme to file a Form S-3ASR registration statement in contemplation of the Company's public offering of Notes and common stock (as modified, the "Registration Statement"). All Individual Defendants signed the Registration Statement. The Registration Statement incorporated by reference Solazyme's 2013 10-K, which was also signed by the Individual Defendants.

66.     The following day, on March 26, 2014, the Individual Defendants caused Solazyme to file a Form S-3MEF registration statement modifying the Registration Statement to register an additional $12.75 million in aggregate maximum principal amount of Notes and stock. All Individual Defendants signed this Form S-3MEF.

67.     On March 27, 2014, the Individual Defendants caused Solazyme to file complete prospectuses in connection with the Notes Offering (the "Notes Prospectus") and the Stock Offering (the "Stock Prospectus," and together with the Registration Statement and Notes Prospectus, the "Offering Documents") with the SEC pursuant to SEC Rule 424(b)(5). These Offering Documents incorporated by

19

Verified Shareholder Derivative Complaint
Demand for Jury Trial

reference Solazyme's 2013 10-K, which was signed by the Individual Defendants.

68.   As set forth in the Notes Prospectus, Solazyme registered $149.5 million in Notes to be offered to the public at $1,000 per $1,000 of par value. As set forth in the Stock Prospectus, Solazyme registered 5.75 million shares of common stock to be offered to the public at $11.00 per share.

69.   The Offering Documents included descriptions of the Company and its facilities, including the status and progress of the Moema Facility. For example, the Offering Documents reiterated the Company's prior positive statements related to the construction progress, development, and production capacity for the Moema Facility:

> We have been working for years to bring large-scale manufacturing of our products online. In advance of this, we initiated our commercialization efforts several years ago by launching low-volume, high-margin branded skin and personal care products and nutritional supplement ingredients that could be produced on an economically attractive basis via tolled manufacturing. Our large-scale Clinton/Galva Facilities are now online, and *the commissioning of the facility at Moema is underway*. As such, *we are now expanding into large-scale, high-volume commercial production of certain products and sales of intermediate and ingredient products across food, industrial, fuel and personal care markets*. While the margins on these products are somewhat lower than those launched initially, the volumes are dramatically larger and present excellent market opportunities.

The Offering Documents also stated that Bunge had agreed to provide utility services to the Moema Facility.

70.   However, the descriptions of the construction progress, development, and production capacity associated with the Company's Moema Facility were materially false and misleading because they failed to disclose that the Moema Facility was experiencing construction delays due to insufficient access to electricity and steam utility services, and that these challenges would prohibit the Moema Facility from scaling its capacity production as projected.

71.   On April 1, 2014, Solazyme announced the successful closing of the

20

Offerings, in which the full underwriters' over-allotment options for both the Notes Offering and Stock Offering were exercised.

**(3)    Solazyme's First Quarter 2014 Financial Report**

72.    After the close of the trading session on May 5, 2014, the Individual Defendants caused Solazyme to issue a press release announcing results of operations for the first quarter of 2014. In connection with this announcement, Wolfson commented in part:

> While we haven't yet announced our first commercial product out of Moema, much of that plant is operational, including full-scale fermenters. We expect to manufacture commercial product at the Moema facility in the second quarter.

73.    Also on May 5, 2014, Solazyme hosted a conference call for investors and analysts, with the Individual Defendants' approval, to discuss the Company's results. As part of his prepared remarks, Wolfson stated that the Moema Facility had encountered significant utility disruptions, and that, provided with only "intermittent power and steam availability," the Moema Facility had failed to produce its first commercial product:

> Commissioning is continuing at the Moema facility, Production equipment, fermentation through Encapso downstream is commissioned and operable, as is fermentation including the 625,000-liter fermenters, and in fact we've successfully inoculated fermentations in the 625,000-liter fermenters multiple times. However, *our facility has been experiencing intermittent power and steam availability* resulting from the start-up of a new cogen facility at the adjoining Moema sugar mill.
>
> *              *              *
>
> Steam and power aside, we are progressing closer to completion of the plant. Key upstream functions our online, and we're making good progress on completing work on oil recovery. Recovery capability through finished Encapso product is now operational, and we're commissioning the oil extraction units that lead to finished oils. Completion of this final stage of oil recovery has taken longer than anticipated, but *we're targeting completion and operation of the full oil recovery processes this quarter. As these processes come fully online, we'll be following the same path as you've seen us follow at Clinton/Galva in terms of a focus on establishing*

*consistent operations*.

74. During a question-and-answer session that followed, Wolfson engaged in the following exchanges:

> Analyst: Hi, guys. Jonathan, a first question on, *you commented that the back end separation at Moema was taking a little bit longer than expected. I always thought your separation process was really pretty simple*, just dry out the fermentation [broth], and press out the oils. You can you provide any more color on what it was that was more complicated than you thought?

> CEO Wolfson*: I wouldn't say it was more complicated*. I would just say that if you break that down into multiple parts, the unit operations to get to the Encapso product, *they're all operable and really have been operable since later March*.

> \*     \*     \*

> Analyst: Hi. I just had a couple of quick questions, one on Moema. You said some of the delays related to a new cogen facility, and you do not expected to be a long-term issue. I'm just wondering if you could give us some more color on that. What is Bunge prioritizing? Are they prioritizing the JV or the sugar mill? *Would there be maybe some intermediate term risk related to that, that maybe this ramp takes a bit longer?* Thanks.

> CEO Wolfson: Bunge's been a phenomenal partner to Solazyme, and I should say, is a phenomenal partner to Solazyme. *I wouldn't read much into this* other than the intermittency of steam and power, it's been something that has been really a recent issue. What I would say about Bunge is that they're operating many facilities, including many cogen facilities very successfully all around the world. *I think between Solazyme and Bunge, we don't have concerns about the reliability of steam and power in the longer term.*

75. On May 8, 2014, the Individual Defendants caused Solazyme to file its quarterly report on Form 10-Q for the first quarter of 2014 with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release. This Form 10-Q also included Sarbanes-Oxley certifications signed by both Wolfson and Painter that were substantially similar to those described in paragraph 64.

///

Verified Shareholder Derivative Complaint
Demand for Jury Trial

**(4)   Solazyme's Second Quarter 2014 Financial Report**

76.   On July 30, 2014, after the close of the trading session, the Individual Defendants caused Solazyme to issue a press release announcing results of operations for the second quarter of 2014. In connection with this announcement, Wolfson commented in part:

> Solazyme made important progress in the second quarter on its commercialization path…. [W]e have begun production and shipment from the Solazyme Bunge Renewable Oils plant in Brazil…. We have more work ahead as we progress on our production ramps and continue to build our commercial pipeline, but I believe we have the products, the plants, the capital and the team to execute moving forward.

The press release also noted:

> Commercial Production Begins at Moema Facility. In late May 2014, Solazyme's joint venture with Bunge Global Innovation LLC successfully produced its first commercially saleable products at the Solazyme Bunge Renewable Oils plant in Brazil and has subsequently begun shipping. Both oil and encapsulated lubricant, Encapso™, products have been manufactured using full-scale production lines that include the 625,000L fermentation tanks.

77.   Also on July 30, 2014, Solazyme hosted a conference call for investors and analysts, with the Individual Defendants' approval, to discuss the Company's results. As part of his prepared remarks, Wolfson stated that the Moema Facility's utility problems had yet to be resolved, noting only that the Company had "made great progress addressing the utility issues":

> At Moema we've made great progress addressing the utility issues. We're almost finished with all of the commissioning.
>
> *          *          *
>
> *All equipment through the finishing process is now installed and commissioning is nearing completion.*

78.   During a question-and-answer session that followed, Cole engaged in the following exchange, in relevant part:

> Analyst: I know it's early, Jon, but *any metrics you can provide on the initial ramp in shipments out of Moema* the way you gave us a bit of detail on the ramp out of Clinton/Galva?

23

President Cole: Hi, Brian. *All unit operations at this point are installed; feedstock prep, seed fermentation, production tanks, sterilizers, downstream drying and packaging. They're all on line.*

79.     On August 1, 2014, the Individual Defendants caused Solazyme to file its quarterly report on Form 10-Q for the second quarter of 2014 with the SEC, which included substantially similar financial results as those set forth in the Company's earlier press release. This Form 10-Q also included Sarbanes-Oxley certifications signed by both Wolfson and Painter that were substantially similar to those described in paragraph 64.

**B.     The Truth Emerges**

80.     After the close of the trading session on November 5, 2014, the Individual Defendants caused Solazyme to issue a press release announcing the Company's results of operations for the third quarter of 2014. Among other things, the Individual Defendants caused Solazyme to report delays in progress at the Moema Facility, stating in relevant part:

> Our Clinton/Galva and Peoria facilities are performing well. *Progress at Moema is more mixed* with the upstream process operating as expected, while the *downstream process will require continued work to establish consistent, fully integrated operations.*
>
> *        *        *
>
> Key downstream unit operations are functional all the way to oil production, and modest quantities of finished product continue to be produced and shipped. *The further optimization and integration of downstream processes and the improvement of reliable power and steam supply at the facility are areas of significant focus.*

Importantly, the Individual Defendants caused Solazyme to further disclose a drastic change in the Company's strategy and outlook for its future, with Wolfson commenting:

> Strategically, we're moving to intensify our focus on our high-value specialty portfolio, *a move that will alter the near-term trajectory of our production ramp* but which we believe will ultimately drive greater value for the Company.

24

Verified Shareholder Derivative Complaint
Demand for Jury Trial

Painter further stated:

> Our near term focus is on bringing Moema to fully integrated operations and focusing commercial activity around our high-value specialty products…. As we execute on these goals, we are emphasizing prudent management of our capital, optimizing our product mix and positioning our manufacturing assets to maximize returns.

81. Also on November 5, 2014, Solazyme hosted a conference call, with the Individual Defendants' approval, to discuss its results with analysts and investors. As part of his prepared remarks, Wolfson stated in part:

> *Operational challenges at Moema are causing a slower than anticipated descent down the manufacturing cost curve.* This will result in higher longer than expected early cost in production.
>
> *   *   *
>
> Real-time consideration of these factors has led us to make some adjustments in our manufacturing, and commercialization strategies to drive capital efficiency and commercial success. Our view is that the destination is largely the same and we think quite possibly even better than it's always been. But the journey will change a bit. *Specifically, we'll narrow our production focus to smaller volumes of higher value products at both Moema and Clinton/Galva.* We will be prioritizing cash management and product margin over a rapid capacity ramp. *We therefore, no longer plan to produce a nameplate capacity within 12 to 18 months.*

82. With the Individual Defendants' approval, Solazyme's Chief Technology Officer then disclosed a substantial list of problems standing in the way of profitable operations at the Moema Facility:

> *Power and steam consistency continues to be an issue.* The fix[es] implemented over the spring and summer have led to improvements resulting in periods of reliability. So these have continued to be interest bearers with setbacks as well. To be clear, *the work that has been done up to now, including a significant focus on backup systems is a partial fix.*
>
> The more robust solution involve tying into the electrical grid and current estimates are now that this will be completed in the first half of 2015. As we've already noted *there is continued work to do on the downstream operations to allow them to run continuously and then in integrated fashion.* Specifically, we are focusing on some correctable issues with the conveyance system. We are also *working to*

25

*achieve consistent processing with the process*, the timing of which is taking longer than we expected. As a reminder, all of the plants key unit operations, including those on the downstream side are working, but *not all of the downstream is working yet efficiently, continuously or on an integrated basis.*

\*       \*       \*

*We're working closely both with teams after JV and our partner Bunge to bring Moema to a fully integrated operations.*

83. In reaction to these disclosures of the truth about the construction delays and diminished production capacity at the Moema Facility, Solazyme's stock price declined $4.35 per share, or 58.08%, to close at $3.14 per share following the next trading session on November 6, 2014. Similarly, the market price of Solazyme's Notes declined by $235.00 per Note from the prior reported trade on November 4, 2014, or 30.32%, to close at $540.00 per Note following the next session in which the Notes traded on November 7, 2014.

84. The false and misleading statements and omissions, which were reviewed and approved by the Individual Defendants, caused the Company's securities to trade at artificially inflated prices during the Relevant Period. However, as the conditions described above were revealed to the market, the prices of the Company's securities fell significantly. For example, Solazyme's stock price fell by $11.56 per share — or 78.64% — from its Class Period-high closing price of $14.70 per share on March 12, 2014. Similarly, the market price of Solazyme's Notes declined by $600.30 per Note — or 52.64% — from their Class Period-high closing price of $1,140.30 on June 27, 2014.

85. The true facts, which were known to, or recklessly disregarded by, the Individual Defendants and concealed from Solazyme's investors and the public during the Class Period, were as follows:

(a) Solazyme's Moema Facility was experiencing difficulties due to insufficient access to electricity and steam utility services;

Verified Shareholder Derivative Complaint
Demand for Jury Trial

(b) the Moema Facility's design and construction relating to the internal transfer of materials and recovery of end products caused it to suffer from problems not present at the Company's other facilities;

(c) the Moema Facility could not scale its production in a cost-effective manner; and

(d) as a result of the foregoing, Solazyme lacked a reasonable basis for its projections relating to the Moema Facility's progress and Solazyme's outlook .

## IX.   DAMAGES TO SOLAZYME

86.   Solazyme has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

87.   As a direct and proximate result of the Individual Defendants' misconduct, Solazyme has expended and will continue to expend significant sums of money, including:

(a)   legal fees associated with the lawsuits, including the Securities Class Action, filed against the Company for violations of the federal securities laws;

(b)   loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Individual Defendants' false statements and lack of candor to the marketplace; and

(c)   amounts paid to outside lawyers, accountants, and investigators in connection with any internal investigations.

## X.   DERIVATIVE ALLEGATIONS

88.   Plaintiff brings this action for the benefit of Solazyme to redress injuries suffered as a result of the Individual Defendants' breaches of fiduciary duties and violations of law, as well as the aiding and abetting thereof.

89.   Solazyme is named solely as a nominal party in this action.

90.     Plaintiff is and has been a Solazyme shareholder during the entire Relevant Period because he has continuously owned Solazyme common stock since January 2014. Plaintiff will adequately and fairly represent the interests of Solazyme in enforcing and prosecuting its rights.

91.     At the time this action was initiated, Solazyme's Board consisted of seven directors, six of whom are defendants in this action: Wolfson, Arbige, Clark, Craigie, Fiddler, and Kovacs.[2] Plaintiff has not made any demand on the Board to institute this action against the Director Defendants because, for the reasons set forth below, such demand would be futile.

## A.     Demand Is Futile as to Wolfson and Kovacs

92.     As Solazyme's co-founder, longtime director, former President, and current CEO, Wolfson is not independent. In fact, Solazyme's March 26, 2015 proxy admits that Wolfson is not an independent director.

93.     As stated in Solazyme's 2015 proxy, Wolfson received total compensation from Solazyme in the amount of approximately $2,960,854 in 2014. His compensations in 2012 and 2013 were $2,534,422 and $3,477,947, respectively. Wolfson co-founded Solazyme in 2003, barely three years after graduating from law school. Wolfson has since then held positions in both its Board and management. Aside from his career at Solazyme, Wolfson has few other substantial professional engagements.

94.     Accordingly, demand is futile as to Wolfson because instituting any action would jeopardize (a) his sole, long-term career, as well as the lavish compensation he is expected to receive in future years from Solazyme; and (b) his right to the bonus and incentive compensation he received for 2014 at a time when Solazyme stock was inflated by the Individual Defendants' wrongdoing. Thus demand is futile as to Wolfson.

---

[2] A seventh director of Solazyme, Gary Pfeiffer, is not a defendant in this action.

95. Moreover, Wolfson is interested because he faces a substantial likelihood of liability for issuing false and misleading statements regarding Solazyme's financial condition and business prospects. In fact, Wolfson signed the Company's SEC filings that contained false and misleading statements, including the 2013 10-K and the Sarbanes-Oxley certifications in the quarterly reports during the Relevant Period. Wolfson therefore faces a substantial likelihood of liability for breaching his fiduciary duties. Consequently, Wolfson cannot disinterestedly consider a demand.

96. Similarly, Kovacs is not independent. In addition to his role as Solazyme's director, Kovacs has been a member of Solazyme's Strategic Advisory Board since 2007. Kovacs is also a member of Solazyme's Scientific Advisory Board. In its 2015 proxy, Solazyme admitted that Kovacs is not an independent director.

**B.  Demand Is Futile as to Craigie and Fiddler**

97. The Audit Committee Defendants — Craigie and Fiddler — were responsible for reviewing and approving quarterly and annual financial statements, earnings press releases, and Solazyme's internal controls over financial reporting. Each Audit Committee Defendant breached his duty of candor and good faith by knowingly approving the false financial statements.

98. For example, before approving the issuance of Solazyme's quarterly and annual financial reports, the Audit Committee Defendants were required to:

(a)  "meet to review and discuss with management and the independent auditor":

- the annual audited financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of the Company's Form 10-K; and

- the quarterly financial statements, including reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to the filing of the

29

Company's Form 10-Q.

(b) "review with management, the internal auditors and the independent auditor":

- any analyses or other written communications prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;

- the critical accounting policies and practices of the Company;

- the effect of off-balance sheet transactions and structures;

- any major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles; and

- the effect of regulatory and accounting initiatives.

99. In breach of these specific obligations, the Audit Committee Defendants either failed to conduct the requisite reviews or conducted only a cursory, perfunctory review of the financial statements. As a result, the Audit Committee Defendants acted in bad faith and abdicated their fiduciary duties when they caused Solazyme to issue the false and misleading financial statements during the Relevant Period, with neither meaningful review nor independent scrutiny.

100. Moreover, the Audit Committee Defendants are responsible for ensuring (a) adequate internal controls; (b) legal and regulatory compliance; and (c) implementation of the Code.

101. In a complete abdication of these responsibilities, however, the Audit Committee Defendants failed to ensure that Solazyme had adequate internal controls over its financial reporting.

102. Accordingly, Craigie and Fiddler face a sufficiently substantial likelihood of liability for breaches of their fiduciary duties of loyalty, candor, and

Verified Shareholder Derivative Complaint
Demand for Jury Trial

good faith. Any demand upon Craigie and Fiddler is futile.

103.   As members of the Audit Committee, defendants Craigie and Fiddler were also responsible for (a) the integrity of Solazyme's financial statements; (b) the Company's systems of internal controls regarding finance and accounting as established by management; (c) the qualifications and independence of the independent registered public accounting firm; (d) the performance of Solazyme's independent registered public accounting firm; and (e) Solazyme's auditing, accounting, and financial reporting processes generally. Defendants Craigie and Fiddler reviewed and approved Solazyme's false and misleading statements that misrepresented its business and financial prospects. Defendants Craigie and Fiddler, as members of Solazyme's Board, each knew, or consciously disregarded, that the public statements were materially false and misleading.

104.   The Audit Committee Defendants also failed to correct the materially false and misleading financial statements. The Audit Committee Defendants signed the Audit Committee Report in Solazyme's April 9, 2014 proxy incorporating all of the false and misleading financial information contained in the 2013 10-K. The Audit Committee Defendants also signed the Audit Committee Report in Solazyme's March 26, 2015 proxy incorporating all of the false and misleading financial information contained in Solazyme's 2014 Form 10-K (filed on March 6, 2015). As such, the Audit Committee Defendants face a substantial likelihood of liability. Demand is thus futile as to Craigie and Fiddler.

**C.     Demand Is Futile as to All Director Defendants**

105.   All Director Defendants — Wolfson, Arbige, Clark, Craigie, Fiddler, and Kovacs — face a substantial likelihood of liability for making and approving the false and misleading statements set forth above, despite knowingly or recklessly disregarding the falsity of such statements. Each Director Defendant signed Solazyme's 2013 10-K, which contained the false and misleading financial

information.

106.   Moreover, because Solazyme's success and financial performance depends on the development of the Moema Facility, the facility constitutes Solazyme's core business, as such, the Director Defendants are charged with the knowledge of the development and operation of the Moema Facility. Accordingly, the Individual Defendants knew or should have known that Solazyme's disclosures regarding the Moema Facility were false and misleading when made.

107.   Because all Director Defendants face a substantial likelihood of liability, any demand upon them is futile.

108.   If Solazyme's officers and directors are protected against personal liability for their acts of mismanagement, abuse of control, and breaches of fiduciary duties alleged in this complaint by directors and officers ("D&O") liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders. Upon information and belief, the D&O insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Solazyme against the Individual Defendants, known as the "insured versus insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Solazyme, there would be no D&O insurance protection. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Board cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under Solazyme's D&O insurance policy.

109.   Although Solazyme has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing, the Board has not filed any lawsuits against any directors or officers who were responsible for the

Verified Shareholder Derivative Complaint
Demand for Jury Trial

losses. Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a substantial likelihood of liability for their breaches. Indeed, the Director Defendants are more interested in protecting themselves than they are in protecting Solazyme by bringing this action. Thus, demand on the Board is futile.

## XI.  CAUSES OF ACTION

### Count I
### Breaches of Fiduciary Duties

110.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth below.

111.   Each of the Individual Defendants owed to Solazyme the duty to exercise candor, good faith, and loyalty in the management and administration of its business, particularly with respect to issues regarding its financial viability.

112.   Each of the Individual Defendants breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

113.   The Individual Defendants' conduct set forth in this complaint was characterized by intentional, reckless, or negligent breaches of the fiduciary duties the Defendants owed to Solazyme, as alleged in this complaint. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Solazyme.

114.   In breach of their fiduciary duties owed to Solazyme, the Individual Defendants willfully participated in misrepresentation of the Company's financial condition, failed to correct Solazyme's public statements, and failed to properly oversee Solazyme's business, rendering them personally liable to Solazyme for breaching their fiduciary duties.

115.   The Individual Defendants had actual or constructive knowledge that they had caused Solazyme to improperly misrepresent its financial condition, and the Defendants failed to correct Solazyme's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of

material facts set forth above, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the common stock of Solazyme.

116. These actions were not a good-faith exercise of prudent business judgment to protect and promote the corporate interests of Solazyme.

117. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Solazyme has sustained and continues to sustain significant damages. As a result of the misconduct alleged above, the Individual Defendants are liable to Solazyme.

**Count II**
**Unjust Enrichment**

118. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth below.

119. By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Solazyme.

120. During the Relevant Period, the Individual Defendants either received bonuses, stock options, or similar compensation from Solazyme that was tied to the financial performance of Solazyme, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

121. Plaintiff, as a shareholder and representative of Solazyme, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breaches of their fiduciary duties.

///

///

Verified Shareholder Derivative Complaint
Demand for Jury Trial

## Count III
## Gross Mismanagement

122.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth below.

123.   The Individual Defendants each owed a duty to Solazyme and its shareholders to, in good faith, supervise, manage, and control its operations.

124.   The Individual Defendants, by their actions or inactions, either directly or through aiding and abetting, abdicated their responsibilities and duties with regard to operating the business and affairs of Solazyme.

125.   By subjecting Solazyme to the unreasonable risk of substantial losses for violations of the federal securities laws, the Individual Defendants breached their duties owed to Solazyme and its shareholders.

126.   As a direct and proximate result of the Individual Defendants' faithless acts, Solazyme has sustained and continues to sustain significant damages and injuries. As a result of the misconduct alleged in this complaint, the Individual Defendants are liable to Solazyme.

## XII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in favor of Solazyme and against all Individual Defendants as follows:

A.   Declaring that Plaintiff may maintain this action on behalf of Solazyme and that Plaintiff is an adequate representative of Solazyme;

B.   Declaring that each of the Individual Defendants breached their fiduciary duties to Solazyme;

C.   Determining and awarding to Solazyme damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with interest;

D.   Determining and awarding to Solazyme restitution from each of the Individual Defendants, and ordering disgorgement of all profits, benefits, and other

35

compensation obtained by them;

E.      Directing Solazyme and the Individual Defendants to take all necessary actions to reform and improve Solazyme's corporate governance and internal procedures to comply with applicable laws and to protect Solazyme and its shareholders from a repeat of the damaging events alleged above, including, but not limited to, enhancements to and improvements for the Company's corporate governance policies;

F.      Awarding to Solazyme exemplary damages in an amount necessary to punish the Individual Defendants and to make an example of the Individual Defendants to the community according to the proof at trial;

G.      Ordering all appropriate equitable and/or injunctive relief against the Individual Defendants to the extent that the Company is unable to obtain from such Individual Defendants an adequate remedy at law;

H.      Awarding to Plaintiff the costs and disbursements of the action, including attorneys' fees, expert fees, costs, and expenses; and

I.      Granting such other and further relief as the Court deems just and proper.

///
///
///
///
///
///
///
///
///
///

Verified Shareholder Derivative Complaint
Demand for Jury Trial

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  August 25, 2015

Respectfully submitted,

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (SBN 175783)
Albert Y. Chang (SBN 296065)
Yury A. Kolesnikov (SBN 271173)

s/ Francis A. Bottini, Jr.
Francis A. Bottini, Jr.

7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:    (858) 914-2001
Facsimile:    (858) 914-2002
Email:        fbottini@bottinilaw.com
              achang@bottinilaw.com
              ykolesnikov@bottinilaw.com

*Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint
Demand for Jury Trial

## VERIFICATION

I, Gregory M. Miller, verify that I am a shareholder of Solazyme, Inc. I have reviewed the allegations made in this Verified Shareholder Derivative Complaint (the "Complaint"). As to the allegations in the Complaint of which I have personal knowledge, I believe them to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Complaint, having reviewed it with my counsel, I authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct. Executed on August ___, 2015, at Durham, North Carolina.

_____      24 AUG 2015
Gregory M. Miller